**BATHAEE DUNNE LLP**
Yavar Bathaee (CA 282388)
yavar@bathaeedunne.com
Andrew C. Wolinsky (CA 345965)
awolinsky@bathaeedunne.com
Priscilla Ghita (*p.h.v.* forthcoming)
pghita@bathaeedunne.com
Bryce W. Talbot (*p.h.v.* forthcoming)
btalbot@bathaeedunne.com
445 Park Avenue, 9th Floor
New York, NY 10022
Tel.: (332) 322-8835

Brian J. Dunne (CA 275689)
bdunne@bathaeedunne.com
Edward M. Grauman (*p.h.v.* forthcoming)
egrauman@bathaeedunne.com
Kathryn J. Johnson (*p.h.v.* forthcoming)
kjohnson@bathaeedunne.com
901 South MoPac Expressway
Barton Oaks Plaza I, Suite 300
Austin, TX 78746
Tel.: (213) 462-2772

Allison Watson (CA 328596)
awatson@bathaeedunne.com
3420 Bristol Street Suite 600
Costa Mesa, CA 92626
Tel: (213) 462-2772

*Attorneys for Plaintiff and the Proposed Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHELLE FENDELANDER, et al., individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NETFLIX, INC., a Delaware corporation,<br><br>Defendant. | Case No. 5:25-cv-10521<br><br>**CLASS ACTION COMPLAINT** |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................1

PARTIES ..............................................................................................................3

JURISDICTION AND VENUE ..................................................................................3

DIVISIONAL ASSIGNMENT ....................................................................................4

FACTUAL BACKGROUND ......................................................................................4

I.      NETFLIX ORIGINATES, AND FOR A WHILE DOMINATES, THE U.S. SUBSCRIPTION
        VIDEO ON DEMAND MARKET..................................................................................4

        A.      Netflix's DVD-by-Mail Origins ...........................................................4

        B.      Netflix Pivots to Streaming, Creating the Subscription Video on Demand Market..........7

        C.      Firms Attempt to Enter the SVOD Market—And Encounter the CSBE ........................10

II.     HBO'S TRANSITION FROM PREMIUM CABLE SERVICE TO SVOD JUGGERNAUT....12

III.    NETFLIX AND WBD AGREE TO MERGE .......................................................15

IV.     THE CONTENT AND SUBSCRIBER BARRIER TO ENTRY................................25

V.      THE RELEVANT MARKET .........................................................................29

        A.      The SVOD Market Is a Distinct Product Market ....................................30

        B.      Market Participants and Market Concentration......................................38

        C.      The Relevant Geographic Market........................................................39

        D.      Barriers to Entry ...........................................................................39

VI.     THE NETFLIX-WBD MERGER, IF CONSUMMATED, WILL RESULT IN A
        SUBSTANTIAL LESSENING OF COMPETITON IN THE UNITED STATES SVOD
        MARKET .................................................................................................40

CLASS ACTION ALLEGATIONS..............................................................................48

CLAIM FOR RELIEF ............................................................................................51

PRAYER FOR RELIEF ..........................................................................................53

**INTRODUCTION**

1.      This is an antitrust lawsuit brought under Section 7 of the Clayton Act to enjoin one of the more audacious horizontal mergers in recent memory—the recently-announced merger between Defendant Netflix Inc. and Warner Bros. Discovery ("WBD").

2.      Netflix is the longstanding leader in a $50 billion market it originated nearly twenty years ago, the U.S. Subscription Video on Demand (SVOD) Market. Once dominant, Netflix's SVOD service faced rising competition in the late 2010s and early 2020s, during a time period when Americans shifted their media consumption habits toward the home—accelerated by the COVID-19 pandemic.

3.      The SVOD Market is protected by a powerful barrier to entry—one characterized by a simultaneous need for a critical mass of high-value, Hollywood-style content and a critical mass of paid (and engaged) subscribers, both to pay for that content and to generate the data necessary to build powerful recommendation and content-surfacing algorithms and systems necessary for a successful SVOD product. Between 2019 and 2021, a small handful of firms—backed by the largest Hollywood studios and operating at loss-leader economics—were able to enter the SVOD Market at scale during a period of unprecedented upheaval in entertainment consumption habits. Out of the pandemic came several Netflix competitors—Disney+ (backed by The Walt Disney Company's vast library of intellectual property), HBO Max (backed by HBO's unparalleled TV library, plus Warner Bros.'s television and film content), and Paramount Plus (backed by content from Paramount Studios and CBS)—in addition to legacy brands Amazon Prime (augmented by Amazon's acquisition of MGM) and Hulu.

4.      Many other SVOD services have tried, and failed, to enter the U.S. SVOD Market—impaled upon the chicken-or-the-egg content-and-subscriber demands of the Content and Subscriber Barrier to Entry (CSBE).

5.      In the past few years, after the SVOD Market emerged post-pandemic with a handful of dominant products—Netflix, Amazon Prime, HBO Max, Disney+, Hulu, and Paramount Plus—market prices have begun to soar, with service quality and output stagnant or degraded. For example, participants marketwide have introduced pre-roll advertisements before paid, subscription content, and have introduced ad-supported tiers at prices that prevailed for ad-free subscription content in very recent

memory. All this while SVOD subscription prices—including for Netflix and for HBO Max—have soared far beyond inflation in recent years and more than doubled in less than a decade.

6.     This marketwide price increase coincides with the recent merger, and ongoing consolidation, of two market-leading SVOD services, Hulu and Disney+, under common ownership, control, and branding. The elimination of a leading SVOD competitor by Disney raised prices, reduced quality, and has not been offset by competitive entry due to the CSBE.

7.     The recently-announced Netflix-WBD merger augers much worse. The proposed tie-up of the SVOD market leader (Netflix) and its SVOD competitor with perhaps the broadest, most unique, and most "must-have" content library in streaming—HBO Max, home of The Sopranos, Game of Thrones, The White Lotus, Harry Potter, The Looney Tunes, and DC Comics—plus tens of millions of engaged subscribers, has raised alarm bells across the United States.

8.     And with good reason. The Netflix-WBD merger would greatly strengthen the CSBE surrounding the U.S. SVOD Market, and at the same time would massively increase concentration in an already calcified and oligopolistic market—a market that has responded to past consolidation with aggressive marketwide price hikes and quality degradation.

9.     The proposed merger would increase the Herfindahl-Hirschman index in the U.S. SVOD market by more than 500 points, from an already moderately concentrated baseline—a massive increase that is presumptively anticompetitive under Department of Justice Horizontal Merger Guidelines.

10.     Based on the characteristics of the U.S. SVOD Market and of the merging entities—including the CSBE and the content libraries and SVOD subscriber bases of the Netflix and WBD, respectively—the Guidelines presumption of anticompetitiveness is powerfully borne out by the specific facts here. If allowed to consummate, the Netflix-WBD merger will substantially decrease competition in the U.S. SVOD Market, harming consumers in that market through increased prices, reduced service quality, and decreased output (including reduced consumer choice). The merger will fortify the CSBE, preventing competitive entry and expansion at the same time the SVOD Market is massively and perhaps irreversibly concentrated.

11. American consumers—including SVOD purchasers like Plaintiff, an HBO Max subscriber—will bear the brunt of this decreased competition, paying increased prices and receiving degraded and diminished services for their money.

12. Plaintiff brings this action on behalf of herself and a class of HBO Max subscribers to enjoin the anticompetitive Netflix-WBD merger.

## PARTIES

13. Plaintiff Michelle Fendelander is a resident of Las Vegas, Nevada. Ms. Fendelander is a current subscriber to WBD's HBO Max SVOD service. Ms. Fendelander has never subscribed to Netflix.

14. Defendant Netflix is a public company incorporated in Delaware and headquartered at 121 Albright Way, Los Gatos, California, 95032, within this judicial district.

15. Netflix has approximately 14,000 full-time employees (as of December 31, 2024). Its annual revenue was approximately $39 billion in 2024, $33.7 billion in 2023, and $31.6 billion in 2022.

16. Netflix has approximately 80 million paid subscribers in the United States.

## JURISDICTION AND VENUE

17. This action arises under Sections 7 and 16 of the Clayton Act (15 U.S.C. §§ 18, 26). Plaintiff and the proposed class seek equitable relief, including an injunction preventing Netflix from acquiring WBD, as well as reasonable attorneys' fees.

18. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 (federal question), 1332 (class action diversity jurisdiction), and 1337(a) (antitrust); and under 15 U.S.C. § 15 (antitrust).

19. Venue is appropriate in this district under 15 U.S.C. § 15(a) (Clayton Act), 15 U.S.C. § 22 (nationwide venue for antitrust matters), and 28 U.S.C. § 1391(b) (general venue provision). Netflix transacts business within the district, and it transacts its affairs and carries out interstate trade and commerce, in substantial part, in this district. Indeed, Netflix is headquartered and has its principal place of business within this judicial district.

20. As described in its 2024 annual report, Netflix leases property in "Los Gatos, California, which is the location of our corporate headquarters." Los Gatos is in the Northern District of California (within the San Jose Division).

21.    The Court has general personal jurisdiction over Netflix because its principal place of business is in California. Moreover, the anticompetitive conduct alleged in this Complaint was targeted at individuals throughout the United States, causing injury to persons in the United States, including in this state and district.

**DIVISIONAL ASSIGNMENT**

22.    This is an antitrust class action for which "venue is proper in any courthouse in this District" under Gen. Order No. 44 § D.3 and Civil Local Rule 3-2(c).

**FACTUAL BACKGROUND**

**I.    NETFLIX ORIGINATES, AND FOR A WHILE DOMINATES, THE U.S. SUBSCRIPTION VIDEO ON DEMAND MARKET**

**A.    Netflix's DVD-by-Mail Origins**

23.    Netflix was founded in 1997 by Reed Hastings and Marc Randolph, two Silicon Valley businessmen from Pure Software (co-founded by Hastings), a onetime startup acquired for $750 million by Rational Software earlier that year. Netflix was at the time an online DVD-rental company designed to capitalize on the emerging popularity of DVDs and the efficiencies of e-commerce. At the time, home video consumption was dominated by brick-and-mortar rental stores like the now-defunct Blockbuster chain. That business model required customers to travel to physical locations, to choose from limited (and potentially checked-out) inventory, and to incur late fees when titles were not returned by a fixed date and/or time.

24.    Netflix introduced a radically different model: an online catalog paired with mail-based fulfillment, allowing customers to order DVDs that would be delivered directly to their homes. This model eliminated the inconvenience of in-store visits and the punitive fee structure common in traditional video rental systems.

25.    Netflix launched its website on April 14, 1998, offering 925 titles available for rental via a pay-per-rental fee of $4.00 per DVD and $2.00 shipping fee, with no required return date or late fees— a major departure from the prevailing rental model. Subscribers could maintain a queue of desired titles, and Netflix would automatically ship the next available DVD upon return of the previous one. This

innovation created a more predictable and frictionless customer experience, driving rapid subscriber growth and increased brand loyalty.

26.    Netflix invested heavily in distribution logistics, building a network of regional shipping centers that enabled most customers to receive DVDs within one business day. Netflix's pricing structure remained in place until September 1999, when Netflix shifted to a monthly subscription model. By the early 2000s, Netflix's DVD-by-mail service had become a national phenomenon, demonstrating that consumers were receptive to more flexible, technology-enabled models of home entertainment.

27.    By 2007, according to *Wired*, Netflix had 6.3 million DVD-rental subscribers and forty-two national distribution centers located across the United States. Furthermore, Netflix's backend had a trove of subscriber information, including names, addresses, and years of video rental data from more than 1 billion DVD rentals in the United States—each tied to a known subscriber, date, time, and location.

28.    Even at this stage, Netflix considered itself a data-driven, Internet-based company. Its putative edge was in its distribution logistics and its trove of subscriber-linked video selection data. Moreover, for nearly a decade Netflix had been soliciting, storing, aggregating, and mining feedback and recommendation data in its DVD business to create a powerful algorithmic recommendation called "Cinematch."

29.    As Netflix data scientists explained in an August 2007 academic paper:[1]

> Netflix, an on-line movie subscription rental service, allows people to rent movies for a fixed monthly fee, maintaining a prioritized list of movies they wish to view (their "queue"). Movies are mailed to them or delivered electronically over the Internet. In the case of DVDs, when they are finished watching the movie they can return it by post and the next DVD is automatically mailed, postage free.
>
> The length of service of subscribers is related to the number of movies they watch and enjoy. If subscribers fail to find movies that interest and engage them, they tend to abandon the service. Connecting subscribers to movies that they will love is therefore critical to both the subscribers and the company. The company encourages subscribers to "rate" the movies that they watch, expressing an opinion about how much they liked (or disliked)

---

[1] James Bennett and Stan Lanning, "The Netflix Prize," *KDDCup '07*, August 12, 2007, ACM 978-1-59593-834-3/07/0008.

a film. To date, the company has collected over 1.9 billion ratings from more than 11.7 million subscribers on over 85 thousand titles since October, 1998. The company has shipped over 1 billion DVDs, shipping more than 1.5 million DVDs a day. It receives over 2 million ratings per day. The company's Cinematch recommendation system analyzes the accumulated movie ratings and uses them to make several hundreds of millions of personalized predictions to subscribers per day, each based on their particular tastes.

The Cinematch recommendation system automatically analyzes the accumulated movie ratings weekly using a variant of Pearson's correlation with all other movies to determine a list of "similar" movies that are predictive of enjoyment for the movie. Then, as the user provides ratings, an on-line, real-time portion of the system computes a multivariate regression based on these correlations to determine a unique, personalized prediction for each predictable movie based on those ratings. If no personalized prediction is available, the average rating based on all ratings for the film is used. These predictions are displayed on the website as red-stars.

30.    In late 2006—while Netflix's sole product was still DVDs-by-mail—the company announced a $1 million "Netflix prize," in which it "put[] out a call to researchers who specialize in machine learning—the type of artificial intelligence use to build systems that recommend music, books, and movies."[2] As the MIT Technology Review explained, "[t]he entrant who can increase the accuracy of the Netflix recommendation system, which is called Cinematch, by 10 percent by 2011 will win the prize."[3]

31.    As the MIT Technology Review explained,

Recommendation systems such as those used by Netflix, Amazon, and other Web retailers are based on the principle that if two people enjoy the same product, they're likely to have other favorites in common too.

But behind this simple premise is a complex algorithm that incorporates millions of user ratings, tens of thousands of items, and ever-changing relationships between user preferences.

To deal with this complexity, algorithms for recommendation systems are "trained" on huge datasets. One dataset used in Netflix's system contains

---

[2] Kate Greene, "The $1 Million Netflix Challenge," *MIT Technology Review* (Oct. 6, 2006), available at https://bit.ly/48WF9XX.

[3] *Id.*

the star ratings–one to five–that Netflix customers assign to movies. Using this initial information, good algorithms are able to predict future ratings, and therefore can suggest other films that an individual might like.

**B.    Netflix Pivots to Streaming, Creating the Subscription Video on Demand Market**

32.    Behind the scenes, Netflix was preparing in late 2006 for a far more audacious endeavor than more accurately recommending new rent-by-mail DVDs.

33.    By the mid-2000s, technological developments in computer networking, multimedia distribution, and digital rights management created the possibility that high-quality, high-value video content could be streamed directly  (and securely) to users over the Internet.

34.    Prior to this shift, most professionally produced long-form video content was delivered through traditional linear cable networks and through physical media such as DVDs. Streaming technology made it feasible that consumers could access Hollywood-style entertainment content—big-budget films, episodic television shows, and the like—instantly, without waiting for physical shipments or adhering to rigid broadcast schedules. And broadband Internet infrastructure and consumer device advances made it feasible that such content could be delivered over the Internet, to ordinary consumer devices like personal computers.

35.    The new technology aligned neatly with Netflix's existing assets—powerful algorithmic recommendation systems, a business model prioritizing seamless direct-to-customer distribution, and a 6.3 million-strong video-watching subscriber base—to create the possibility that Netflix could expand its existing business (a large library of Hollywood-style movies and TV shows, accessible to users on a monthly subscription basis) beyond the world of physical media. The Subscription Video on Demand Market was about to be born.

36.    But first, Netflix needed content for its new service. For years, Netflix had purchased physical media (DVDs) produced by studios like Disney, Warner Bros., Universal, Paramount, Fox, Sony/Columbia, and MGM, then distributed this media through the mail to Netflix subscribers. This represented a near-unlimited library of content from which Netflix subscribers could select—but for both technological and legal reasons, Netflix couldn't just stream its DVD library to users, let alone at scale. And without content—a large library of content similar in scope and depth to that which Netflix offered

through its existing DVD-on-demand service—Netflix's new SVOD service would never serve as an adequate standalone product for existing users, let alone new ones.

37.     But Netflix had two benefits at the launch of its new SVOD product in the mid-and-late 2000s—both relatively unique and scarcely available to would-be SVOD entries in the future, let alone today.

38.     The first benefit was that Netflix launched its SVOD service as a free add-on to an existing, popular subscription video product—its 6.3 million subscriber-strong DVD-on-demand service. As a result, Netflix did not need a massive content library at launch to attract subscribers, who were already paying for a separate service with already-acquired content. Rather, Netflix was able to develop its streaming content library progressively, over a period of years, as the underlying technology progressed even further and as its millions of existing subscribers were introduced to SVOD as a new benefit to their existing subscription, rather than something justifying a new monthly charge on their credit card.

39.     The second benefit was that Netflix's new product—at-scale, subscription video on demand over the Internet—was completely new, so new that it represented a completely new revenue source for Hollywood studios. As a result, Netflix had a huge first-mover advantage in licensing negotiations for the content it needed to build out and mature its new SVOD service. That is, granting a new "SVOD" license to Netflix represented wholly new revenue for a studio, and there was no one but Netflix to negotiate against for such revenue. Between 2006 and 2008, Netflix signed direct distribution deals with CBS and Disney, and a further deal with premium linear network Starz to offer on-demand content that Starz directly licensed from studios including Disney and Sony—the latter deal later described by a media analyst as "probably one of the dumbest deals ever" for the content providers (but not for Netflix).[4]

40.     Indeed, as Netflix's subscriber base grew, traditional media companies initially viewed the streaming model as an incremental revenue source rather than a disruptive threat. Many licensed their

---

[4] *See, e.g.,* Ethan D. Tussey, "Netflix Streaming Service Takes Aim at Traditional TV," UCSB Carsey-Wolf Center, Media Industries Project (2011), available at https://bit.ly/44NziNv.

film and television libraries to Netflix, allowing the SVOD company to assemble a compelling catalog of diverse content at relatively low cost. This early licensing success further strengthened Netflix's offering and fueled rapid subscriber growth.

41.    By 2011, Netflix's onetime experiment with streaming had become its primary business, and the company devised a plan to make SVOD not just its principal, but its only, product. As CNET explained:

> In the spring of 2011, Hastings, Netflix's widely admired chief executive, held a meeting with his management team and outlined his blueprint to jettison Netflix's DVD operations. Netflix managers would tell subscribers on July 12 that they planned to do away with a popular subscription that offered access to DVD rentals as well as unlimited on-demand streaming video for $10 per month. DVDs and streaming would be separated and each would cost subscribers $7.99 a month, or $15.98 for both, about a 60 percent hike. The changes would take place in September.

42.    Netflix's initial announcement about splitting its SVOD and DVD business was poorly received (and indeed temporarily reversed), but the die was cast: Netflix's SVOD service had sufficient content, sufficient eyeballs, and sufficient subscription revenue that it (and the powerful analytics data and recommendation models it generated) would be Netflix's sole material focus going forward.

43.    Netflix introduced consumers to the concept of a fixed monthly subscription granting unlimited access to a digital library of licensed content available instantly and at the press of a button. This model represented a dramatic departure from pay-per-title digital rentals, a substantial improvement on Netflix's longstanding DVD-on-demand subscription model, and formed the basis for a new Subscription Video on Demand Market in the United States.

44.    The early success of Netflix's SVOD service demonstrated strong consumer demand for on-demand access to high-quality, Hollywood-style video content, available as a broad library through subscription. As the service gained scale, Netflix invested heavily in engineering, user-interface development, and recommendation algorithms that improved consumer engagement. The company's sophisticated personalization systems increased viewing time and reduced churn, strengthening Netflix's position and accelerating consumer adoption of SVOD media consumption.

45.     By 2013, Netflix's SVOD service featured content from nearly every major film studio and from many pay-TV networks; it had millions of subscribers; and it was accessible everywhere in the United States through a wide variety of devices including smartphones, tablets, personal computers, set-top boxes, and smart TVs. That year, Netflix began in earnest to produce its own Hollywood-style content for its SVOD service, with the new "Netflix Original" drama *House of Cards*.

46.     In the first half of the 2010s, the defining features of SVOD coalesced into a clear set of market characteristics: professionally produced long-form content, unlimited on-demand access via a high-speed Internet connection, fixed monthly pricing, and platform-curated libraries.

47.     By the mid-2010s, Netflix was raking in huge amounts of subscriber revenue from its SVOD product. Other firms—both technology companies and major studios—took notice.

### C.     Firms Attempt to Enter the SVOD Market—And Encounter the CSBE

48.     Throughout the 2010s, a large number of firms attempted to enter the United States SVOD Market. However, successful entry proved elusive, as a significant barrier to entry emerged—the Content and Subscriber Barrier to Entry (CSBE). Specifically, SVOD success requires both a critical mass of high-value Hollywood-style content (to attract paying subscribers and maintain their engagement) and a critical mass of engaged subscribers (to pay for needed content and to provide the data necessary to properly target and surface content within a vast library).[5]

49.     Netflix managed to achieve success in the SVOD Market by using its first-mover advantage to acquire content at a discount; by using its legacy subscriber base and data trove to bootstrap subscription revenue and targeting/recommendation algorithms; and by building both these over a period of years as an add-on to an existing, successful DVD-on-demand subscription product.

50.     Newer entrants and would-be entrants found the CSBE to be a serious problem.

51.     For example, one of the earliest SVOD entrants after Netflix was Amazon. To overcome the subscriber problem with SVOD entry, Amazon made its Prime Video SVOD service a free corollary to an existing subscription product, Amazon Prime, and like Netflix before it leveraged a massive trove

---

[5] The CSBE is described in more detail later in this Complaint.

of user data and powerful recommendation algorithms to bootstrap its Prime Video SVOD service. But Amazon still faced a content problem, and after years of spending billions of dollars on original and exclusive content, Amazon eventually bought a legacy movie studio, the once-storied MGM, in 2022 for $8.45 billion. Despite all this, it is still not clear how much revenue Amazon obtains from its Prime Video SVOD product, which to this day operates as a component of Amazon's Prime e-commerce and shipping subscription product.

52.    Hulu, originally a joint venture of NBCUniversal and Fox—later with the participation of Disney and Time Warner, launched an SVOD service in 2010—and despite a significant early-mover advantage including joint ownership by major content providers, the service was ultimately sold outright to Disney by 2023 and is planned to be discontinued by its corporate parent.

53.    Other firms tried and failed to maintain SVOD offerings, including NBCUniversal's comedy-centered SVOD service Seeso, which launched in January 2016 and was effectively shuttered within two years. Seeso lacked both broad content and a broad subscriber base, and despite the involvement of sophisticated entertainment executives and state-of-the-art infrastructure never approached market success.

54.    At the same time, between 2013 and 2020 a small number of SVOD offerings utilized exclusive content libraries—usually tied to a major studio with which the SVOD service was expressly branded—cross-product messaging, and free trials to obtain a foothold in the SVOD market. For example, Disney launched its Disney+ SVOD service in 2019 with a focus on the company's vast owned-and-controlled content library, including content from 20th Century Fox (which Disney purchased in 2018), Disney Animation, Pixar, Lucasfilm, and Marvel. Disney extensively marketed the new service through its popular linear television channels, its theme parks, and through existing subscriber lists, and offered deep discounts including free trials at launch. Despite all this, Disney+ still spent years as a significant loss-leader for its parent, The Walt Disney Company, which ultimately decided to combine it with the legacy Hulu SVOD service in the near future.

55.    All but two of the remaining major Hollywood studios—owners of unmatched libraries of desired library content, and the infrastructure and connections to make desirable original content at

scale—launched studio-branded SVOD services in the late 2010s, including NBCUniversal (Peacock), Paramount (Paramount Plus), and Warner Bros. (HBO Max). Like Disney, these major studios leveraged their existing products and customer bases to heavily market their new SVOD products, offered deep early discounts and free trials, and still found themselves struggle for years to obtain significant market share.

56.    By 2020—after the COVID-19 pandemic forcibly redirected Americans' viewing habits toward home media consumption—the size of the United States SVOD market as a whole exploded, but the market itself calcified into an oligopoly dominated by Netflix, plus the legacy movie studios Disney/Fox, Warner Bros., NBCUniversal, and Paramount. Apple and Amazon—two of the world's largest technology companies, with direct access to hundreds of Americans each—poured billions of dollars into SVOD products (with Amazon even buying legacy major studio MGM, and Apple reportedly spending $5 billion per year to develop and license original content), for the remaining places in the U.S. SVOD market.

57.    Notwithstanding the billions of dollars spent by its competitors, Netflix has remained the dominant SVOD provider, leading the industry in subscribers, viewing time, and original content spending. Netflix's scale advantages have enabled it to invest more heavily in content production than any rival, to negotiate favorable licensing terms, and to deploy refined personalization algorithms powered by vast amounts of user data. These advantages have made it increasingly difficult for competitors to match Netflix's breadth and depth of offerings.

## II.    HBO'S TRANSITION FROM PREMIUM CABLE SERVICE TO SVOD JUGGERNAUT

58.    Home Box Office was founded in 1972 as a joint venture between Sterling Communications and Time Life Broadcasting, Inc. It was the first subscription-based premium television service in the United States. Initially available only to cable subscribers in Wilkes-Barre, Pennsylvania, HBO offered commercial-free access to theatrical films and exclusive sports programming.

59.    At a time when American households were limited to broadcast networks and basic cable, HBO introduced a new paid television model in which consumers purchased higher-quality programming for an additional monthly fee.

60.     Through the late 1970s and early 1980s, HBO expanded nationally as cable television infrastructure spread across the United States. HBO distinguished itself through exclusive licensing agreements with Hollywood studios and early investments in original programming. By 1980, HBO had more than 4 million subscribers, and by the mid-1980s it had become one of the most widely distributed premium channels in the country.

61.     HBO's strategic commitment to original content accelerated in the 1990s, marking the beginning of its "prestige television" era. Hit original content, including The Sopranos and Sex and the City, earned widespread critical acclaim, demonstrating that cable networks could produce content that rivaled or exceeded the quality of major broadcast networks. HBO's brand became synonymous with creative freedom, high production values, and artistic ambition.

62.     As HBO entered the 2000s, it had firmly established itself as the premier destination for high-quality serialized dramas. Programs like The Wire, Six Feet Under, Deadwood, and later Game of Thrones solidified HBO's reputation. HBO also built a formidable library of stand-up comedy specials, documentaries, and late-night programming. Despite this growing influence, HBO remained tethered to the cable and satellite ecosystem, limiting its ability to reach customers directly.

63.     The rise of broadband internet and the early success of Netflix's streaming model forced HBO to experiment with digital distribution. In 2010, HBO launched HBO Go, a streaming service available only to users who already subscribed to HBO through a cable provider. Tethering the streaming service to an existing cable subscription preserved HBO's relationships with multichannel distributors but prevented the company from fully capitalizing on the growing demand for stand-alone streaming services.

64.     Recognizing the need for a direct-to-consumer offering, HBO introduced HBO Now in 2015. For the first time, consumers could cut the cord and subscribe to HBO without a cable subscription. HBO Now offered essentially the same content as the linear channel but operated as a distinct streaming platform. Despite gaining several million subscribers in its early years, HBO Now remained smaller than SVOD leaders such as Netflix, Hulu, and Amazon Prime Video, in part because HBO's content catalog was narrower and its digital infrastructure less mature.

65.     Meanwhile, HBO's corporate parent, Time Warner Inc., saw significant corporate reorganization—and shifting priorities. In 2016, AT&T announced its intention to acquire Time Warner for $85 billion, a merger that closed in 2018 after extensive litigation with the United States Department of Justice. As part of this acquisition, HBO became part of the newly formed WarnerMedia, a vertically integrated media conglomerate that included Warner Bros. Pictures, Turner networks, and other entertainment assets.

66.     AT&T pushed HBO to expand its product catalog and compete more directly with Netflix in the streaming arena. Under this strategic direction, WarnerMedia began developing a unified direct-to-consumer platform that would incorporate HBO's prestige content with Warner's extensive film and television library.

67.     This initiative culminated in the creation of HBO Max, a broader and more diversified streaming service that launched in 2020, combining the entire HBO catalog with content from Warner Bros., DC Entertainment, Cartoon Network, and other WarnerMedia-owned content. The service debuted with both original programming and a deep catalog of films and series, significantly expanding the breadth of HBO's traditional offering.

68.     HBO Max's launch represented a fundamental transformation of HBO from a narrow premium cable channel into a full-scale SVOD business—and a direct competitor to Netflix. While HBO had long relied on a single high-priced subscription tier, HBO Max adopted flexible tiers—including, eventually, an ad-supported plan—allowing it to reach a broader audience.

69.     HBO's deep content library and diversified programming strategy positioned it to compete head-to-head with Netflix and other major SVOD services. By mid-2021, combined HBO/HBO Max subscribers in the U.S. and globally exceeded 60 million, reflecting strong consumer interest in WarnerMedia's streaming pivot.

70.     In May 2021, AT&T announced that it would spin off WarnerMedia. Discovery, Inc. (the owner of the Discovery Channel, Food Network, and other lifestyle- and reality-focused media brands) and WarnerMedia would merge to form WBD. This merger, completed in April 2022, created one of the

largest entertainment conglomerates in the world, combining Warner's scripted entertainment assets with Discovery's unscripted and lifestyle content portfolio.

71.     WBD thus inherited multiple overlapping streaming services including HBO Max and Discovery+, as well as several international platforms. Because of this overlap, WBD leadership decided to consolidate its SVOD services to eliminate redundancies and achieve scale economies. WBD therefore decided to combine HBO Max and Discovery+ into a single, unified streaming platform.

72.     In 2023, WBD rebranded HBO Max as simply "Max," which now integrated content from Discovery+. The rebrand reflected WBD's desire to broaden the service's identity beyond HBO's traditional premium image and signal the availability of a wider variety of genres, including lifestyle, reality, and unscripted content.

73.     The change, however, generated consumer confusion, and in 2024 the company temporarily reinstated HBO Max branding in certain marketing and interface contexts to reassert HBO's value as the platform's flagship content brand. In 2025, WBD reverted back to the "HBO Max" branding, reflecting WBD's long-term strategy to maintain a unified service identity while continuing to highlight HBO as an anchor content tier within the broader streaming platform.

74.     While Netflix has remained the dominant SVOD provider—including based on total subscribers and total viewing time—WBD's HBO Max has consistently ranked among the top competitors in the premium segment.

75.     In short, WBD's Max service remains one of the most important competitors to Netflix in the United States SVOD Market, supported by WBD's diverse library and HBO's prestigious content and brand identity.

## III.     NETFLIX AND WBD AGREE TO MERGE

76.     On July 18, 2024, the *Financial Times* broke news that WBD was exploring the possibility of breaking up the company to shield WBD's profitable studio and direct-to-consumer divisions from its loss-generating, unprofitable television networks.[6]

---

[6] https://bit.ly/3YcxpuS.

77.    As the Financial Times article, titled "Warner Bros Discovery drafts break-up plan" reported:

> Warner Bros Discovery has discussed a dramatic plan to split its digital streaming and studio businesses from its legacy television networks as the US media giant behind CNN and HBO weighs options for boosting its sagging share price.

> People familiar with the matter said chief executive David Zaslav was examining several strategic options, ranging from selling assets to hiving off its Warner Bros movie studio and Max streaming service into a new company unburdened by most of the group's current $39bn net debt load.

78.    Notably, a split would require the company to deal with sports and other content rights to be shared between the two resulting entities:

> A split could face other complications, creating two separate companies needing to negotiate terms for sharing sports rights and other content that WBD currently distributes on both digital and traditional television platforms.

79.    In December 2024, WBD reorganized itself into two units: Streaming & Studios (which included the HBO content and the Max service) and Global Linear Networks (which housed cable TV channels including CNN, HGTV, and the Discovery Channel).[7] As WBD announced in a December 12, 2024 press release titled, "Warner Bros. Discovery Announces New Corporate Structure to Enhance Strategic Flexibility":

> Warner Bros. Discovery Inc. (the "Company") (Nasdaq: WBD) today announced that its Board of Directors has authorized the company to implement a new corporate structure designed to enhance its strategic flexibility and create potential opportunities to unlock additional shareholder value.

> Under this new corporate structure, Warner Bros. Discovery will serve as the parent company for two distinct operating divisions:

---

[7] https://bit.ly/3Ydlc9d.

- Global Linear Networks: A premier linear television business that operates some of the most renowned networks with compelling news, sports, scripted and unscripted programming.

- Streaming & Studios: A globally scaled streaming platform and storied film and entertainment studios with a portfolio of the world's most beloved intellectual property

80.    The move separated the valuable streaming division so that it could more easily be spun out or sold. As WBD President and CEO David Zaslav stated in the press release:

> We continue to prioritize ensuring our Global Linear Networks business is well positioned to continue to drive free cash flow, while our Streaming & Studios business focuses on driving growth by telling the world's most compelling stories. Our new corporate structure better aligns our organization and enhances our flexibility with potential future strategic opportunities across an evolving media landscape, help us build on our momentum and create opportunities as we evaluate all avenues to deliver significant shareholder value.

81.    The move, which signaled a willingness to sell off the streaming division, sent WBD's stock up by approximately 15%—and into positive territory for the first time in 2024.[8] The decision further fueled speculation on Wall Street that WBD would spin off its Global Linear Networks business or sell its Streaming and Studios business.

82.    On May 8, 2025, and after WBD missed first quarter earnings estimates, CNBC reported that WBD was still exploring a potential breakup—spinning off its cable businesses to focus on its profitable SVOD business.[9] As CNBC reported on "Squawk on the Street":

> What Warner Brothers is moving towards, though, is a split, and it's become relatively clear to me from the many conversations that I've had that we could get some sort of an announcement in the not too distant future that they are planning to try to split the company. What would that split look like? Well, most likely, or almost definitely, it's the linear cable networks and then you have the studio coupled with Max.

---

[8] https://bit.ly/44Y1G4j.
[9] https://bit.ly/44Lk7Js.

83. The plan was formally announced on June 9, 2025, with WBD splitting into streaming and studios businesses: Warner Bros. (which would house the lucrative Warners film and TV studios, DC Studios, HBO, HBO Max, and the TCM cable channel) and Discovery Global (which would house the cable business as well as the Discovery+ SVOD service).[10]

84. As CNBC reported in a June 9, 2025 article titled, "Warner Bros. Discovery to split into two public companies by next year":

> Warner Bros. Discovery plans to split into two public companies by next year, the media giant announced Monday, the latest upheaval in the industry as consumers transition from cable to streaming.
>
> WBD will separate into a streaming and studios company, which will include its movie properties and streaming service HBO Max, and global networks company, which will include CNN, TNT Sports and Discovery, among other businesses.
>
> CEO David Zaslav will lead the streaming and studios company. Current CFO Gunnar Wiedenfels will become CEO of the global networks business.

85. On September 10, WBD stated that the split would be complete by April 2026.[11]

86. The next day, September 11, the Wall Street Journal reported that Paramount Skydance was considering a bid to acquire the entirety of WBD—including both the profitable Warner Bros. business and the less successful Discovery Global business.[12]

87. As the Wall Street Journal reported in a September 12, 2025 article titled, "Paramount Skydance Prepares Ellison-Backed Bid for Warner Bros. Discovery":

> Paramount Skydance is preparing a majority cash bid for Warner Bros. Discovery that is backed by the Ellison family, according to people familiar with the situation.
>
> The bid will be for the entire company, including its cable networks and movie studio, the people said. Warner said late last year it planned to

---

[10] https://bit.ly/48V6sC5.
[11] https://bit.ly/3Mhqfmz.
[12] https://bit.ly/4rBJkzQ.

restructure into two operating divisions, one focused on the legacy cable-television business and the other on streaming studios.

88.     The deal would unite vast content libraries and garner antitrust scrutiny. Importantly, it would prevent other streaming rivals from acquiring precious content:

> By preparing a play for the company before Warner's planned split, Paramount Skydance is attempting to pre-empt a potential bidding war for the studio and streaming unit that could include deep-pocketed technology companies such as Amazon.com and Apple.
>
> If successful, such a deal would bring together two of Hollywood's most storied studios and the parent companies of streaming services HBO Max and Paramount+. Warner is home to "Barbie," DC Comics, Harry Potter and TV shows such as "The White Lotus," as well as cable networks CNN, TBS and TNT.
>
> The scale of the potential combination could bring antitrust and regulatory scrutiny.

89.     Indeed, such an acquisition would have integrated overlapping assets between Paramount and WBD, including the HBO Max and Paramount+ SVOD services, two major film studios (Warner Bros. and Paramount Pictures), and CNN and CBS News—among other businesses.

90.     Public reports stated that Paramount would offer between $22 to $24 per share in an all-cash transaction.[13]

91.     Aware of the potential harm to competition through the merger of two of the largest participants in the United States SVOD Market, Senator Elizabeth Warren denounced the prospective deal.[14] As The Wrap reported in a September 11, 2025 article titled, "Elizabeth Warren Warns Paramount-Warner Bros. Discovery Merger 'Must Be Blocked': 'Dangerous Concentration of Power'":

> Just hours after news broke that the Ellison family is preparing a bid to acquire Warner Bros. Discovery, Sen. Elizabeth Warren (D-MA) said a potential merger between Paramount and Warner Bros. Discovery "must be blocked."

---

[13] https://bit.ly/4oDepQX.
[14] https://bit.ly/3YcxFKm.

With the ink on the Skydance-Paramount merger barely dry after the deal officially closed in early August, the Democratic senator from Massachusetts warned that the company acquiring Warner Bros. Discovery as well would be a "dangerous concentration of power."

92.    On September 18, 2025, public reports indicated that Netflix was evaluating whether to submit a bid to acquire WBD.[15] As Puck News reported in an article titled, "Puck In the Room":

It seems hard to imagine—*maybe* Netflix would want the studio and streaming division—but the whispers, themselves, are indicative of this feverish new era of M&A activity, catalyzed in large part by Ellison's entry into the space. Ellison's seemingly limitless cash and ambition have accelerated Hollywood's consolidation process, and his decision to bid for *all* of WBD now—in an attempt to preempt potential rivals—is forcing nearly everyone to dust off their models.

93.    Additional reporting on October 2, 2025, suggested that Comcast and Apple were likewise considering making an offer for some or all of WBD's assets.[16]

94.    On October 8, 2025, Netflix Co-CEO Greg Peters stated that Netflix was "builders rather than buyers."[17]

95.    On October 11, 2025, *Bloomberg News* reported in an article titled "Warner Bros. Is Said to Rebuff Paramount Takeover Approach," that WBD had rejected Paramount's proposed offer of $20 per share.[18]:

Warner Bros Discovery Inc. has rebuffed Paramount Skydance Corp.'s initial takeover approach for being too low, according to people familiar with the matter.

Warner Bros. rejected Paramount's offer of around $20 per share in recent weeks, the people said, asking not to be identified because the matter is private.

96.    WBD's CEO, David Zaslav, expressed confidence that once the businesses were split, he could garner a significant premium for the streaming business:

---

[15] https://bit.ly/3MwFXdo.
[16] https://bit.ly/3MwG88y.
[17] https://bit.ly/44eFFxW.
[18] https://bit.ly/44Jfpfi.

1

2

3

> Warner Bros. CEO David Zaslav believes he can get a hefty premium for his streaming and studios businesses once they're separated from the able channels, Bloomberg News previously reported. To clinch a deal, Ellison will have to convince him that he isn't leaving money on the table by selling before that happens.

4

5

97.    Throughout October 2025, Paramount reportedly submitted three separate bids—at $19, $22, and $23.50 per share—all of which WBD rejected.[19]

6

7

98.    On October 21, 2025, WBD publicly announced that it had "initiated a review of strategic alternatives to maximize shareholder value, in light of unsolicited interest the Company has received from multiple parties for both the entire company and Warner Bros."[20]

8

9

10

99.    On October 27, 2025, Bloomberg News reported that, if Paramount's offer was accepted, the company's leadership, including David Ellison, intended to retain WBD's creative teams and core assets, including its cable networks, and to pursue a combination of HBO Max and Paramount+.[21] Reporting also indicated that WBD CEO David Zaslav might be retained in a senior leadership role and that he could receive compensation of approximately $500 million in connection with a sale.[22]

11

12

13

14

15

16

100.    On October 31, 2025, *Reuters* reported in an article titled, "Exclusive: Netflix taps bank to explore bid for Warner Bros Discovery," that Netflix was actively evaluating a bid for WBD's studio and streaming operations:[23]

17

18

19

> Netflix (NFLX.O) is actively exploring a bid for Warner Bros Discovery (WBD.O) studio and streaming business, retaining a financial advisor and gaining access to financial information, according to three sources familiar with the matter.
>
> The video streaming service has hired Moelis & Co, the investment bank that advised Skydance Media on its successful bid for Paramount Global, to evaluate a prospective offer, two of the sources said. Netflix also has been granted access to the data room, which contains financial details

20

21

22

23

24

25

26

27

[19] https://bit.ly/4rLN4yG.
[20] https://bit.ly/4iH0k3E.
[21] https://bit.ly/4iKwwTT.
[22] https://bit.ly/4rLr47f.
[23] https://bit.ly/4aCLB7O.

28

1

2

> needed to make a bid, according to two of the sources familiar with the matter. . . .
>
> Owning Warner Bros' studio business would give Netflix control over some of Hollywood's most successful stories and characters, including the Harry Potter and DC Comics franchises. Warner Bros' prolific television studio also produces many of Netflix's hits, including original series like "Running Point," "You" and "Maid." HBO and its companion streaming service would add more prestige dramas, and subscribers.

3

4

5

6

7    101.    Indeed, the acquisition would provide Netflix with control over numerous valuable

8  intellectual property franchises—including Harry Potter, Looney Tunes, Tom and Jerry, Scooby-Doo,

9  Hanna-Barbera, and DC Comics—along with HBO's premium scripted programming.

10    102.    On November 6, 2025, Reuters reported that Comcast had engaged Goldman Sachs and

11  Morgan Stanley to advise on a potential offer for WBD's studio and streaming assets.[24]

12    103.    On November 17, 2025, Congressman Darrell Issa, the Senior Member of the House

13  Judiciary Committee and Chairman of its Subcommittee on Intellectual Property, Artificial Intelligence,

14  and the Courts, wrote to Attorney General Pam Bondi and Gail Slater, the Assistant Attorney General for

15  the Antitrust Division of the Department of Justice to express competitive concerns with Netflix acquiring

16  WBD's SVOD business.[25]

17    104.    Congressman Issa's letter stated:

18

> With more than 300 million global subscribers and a vast content library, Netflix currently wields unequaled market power. Adding both HBO Max's subscribers and Warner Bros.' premier content rights would further enhance this position, reportedly pushing the combined entity above a 30 percent share of the streaming market: a threshold traditionally viewed as presumptively problematic under antitrust law.

19

20

21

22    105.    On November 21, 2025, CNBC reported that Paramount, Netflix, and Comcast each

23  submitted formal bids. Paramount sought to acquire the entirety of WBD, while Netflix and Comcast

24  submitted bids for WBD's studio and direct-to-consumer businesses.[26] According to CNBC, WBD's

25

26    [24] https://bit.ly/4ayTCL2.

27    [25] https://bit.ly/4oISiZo.

     [26] https://bit.ly/3XI1aU8.

28

leadership planned to determine whether to proceed with a corporate split or a full sale before the end of 2025.

106.     On December 2, 2025, Bloomberg News reported that Comcast had submitted a proposal to merge Warner Bros. with NBCUniversal, with Comcast assuming control of the combined entity and WBD shareholders receiving a mix of cash and stock.[27]

107.     Netflix, by contrast, submitted a predominantly cash offer for WBD's studio and streaming assets. Paramount also submitted a new bid—this time a 100-percent cash offer financed in part by Apollo and Middle Eastern sovereign-wealth funds.

108.     On December 4, 2025, Paramount publicly accused WBD of conducting an unfair bidding process that favored Netflix and asserted that a deal with Netflix would not survive regulatory scrutiny/ As Variety reported on December 5, 2025, in an article titled, "Would Donald Trump Try to Block Netflix's Takeover of Warner Bros.?":

> Behind the scenes, Paramount has been steadily banging the drum in insisting that a Netflix-Warner Bros. union would be doomed from a regulatory perspective. In a letter this week to lawyers for WBD, Paramount warned that a sale to Netflix probably would "never close" because of regulatory challenges, the Wall Street Journal reported Thursday. "Acquiring Warner's streaming and studio assets 'will entrench and extend Netflix's global dominance in a matter not allowed by domestic or foreign competition laws,' Paramount's lawyers wrote," per the WSJ report.

109.     On December 5, 2025, Netflix announced that it had reached an agreement to acquire WBD's studio and streaming businesses for $23.25 in cash and $4.50 in shares of Netflix common stock for each share of WBD common stock outstanding at the closing of the transaction. The transaction values WBD at $27.75 per share, implying a total equity value of approximately $72 billion and a total equity value of approximately $82.7 billion. Netflix filed the Agreement and Plan of Merger (the "Merger Agreement") with the SEC that same day.[28]

---

[27] https://bit.ly/4oKuYKZ.
[28] https://bit.ly/4oDu03b.

110.    In a December 5, 2025, press release announcing the Merger, Netflix CEO Ted Sarandos observed that "[b]y combining Waner Bros.'s incredible library of shows and movies—from timeless classics like *Casablanca* and *Citizen Kane* to modern favorites like *Harry Potter* and *Friends*—with our culture-defining titles like *Stranger Things*, *KPop Demon Hunters* and *Squid Game*, we'll be able to do that even better. Together, we can give audiences more of what they love and help define the next century of storytelling."[29]

111.    In the same release, WBD President and CEO David Zaslav stated that "[t]oday's announcement combines two of the greatest storytelling companies in the world to bring to even more people the entertainment they love to watch the most." He continued: "For more than a century, Warner Bros. has thrilled audiences, captured the world's attention, and shaped our culture. By coming together with Netflix, we will ensure people everywhere will continue to enjoy the world's most resonant stories for generations to come."

112.    In a December 5, 2025, investor call, Netflix CFO Spencer Adam Neumann stated that "this deal will close after WBD separates its Global Networks division, Discovery Global, into a new publicly traded company, which is now expected to happen in Q3 of 2026. Our transaction, which has been unanimously approved by the Boards of both Netflix and WBD is expected to close in 12 to 18 months, subject to customary closing conditions, including WBD shareholder and regulatory approval."[30]

113.    In the hours after the deal was announced, Senate Antitrust Committee Chairman Mike Lee of Utah warned that the Netflix-WBD transaction "if it were to materialize, would raise serious competition questions—perhaps more so than any transaction I've seen in about a decade."

114.    Senator Elizabeth Warren similarly described the proposed deal as "an anti-monopoly nightmare." Senator Warren stated that a "Netflix-Warner Bros. would create one massive media giant with control of close to half of the streaming market—threatening to force Americans into higher subscription prices and fewer choices over what and how they watch, while putting American workers at risk."

---

[29] https://bit.ly/3KOR4xR.
[30] https://bit.ly/3KPAFcz.

115.    Michael O'Leary, CEO and president of Cinema United, the biggest trade organization representing movie theaters, said the following in a statement December 5 statement about the Netflix acquisition: "Regulators must look closely at the specifics of this proposed transaction and understand the negative impact it will have on consumers, exhibition, and the entertainment industry."[31]

116.    Variety also reported that a "consortium of top industry players" sent an open letter to Congress expressing the potential for "economic and institutional meltdown In Hollywood if Netflix succeeds in its efforts to acquire Warner Bros. Discovery."[32] The authors of the letter insisted on anonymity, according to Variety, out of "fear of retaliation, given Netflix's considerable power as a buyer and distributor." The letter argued that a post-Merger Netflix would possess "enough market influence to reduce the footprint of theatrical moves and force down subsequent licensing fees paid in post-theatrical windows."

## IV.    THE CONTENT AND SUBSCRIBER BARRIER TO ENTRY

117.    The Subscription Video on Demand Market is protected by a powerful barrier to entry that arises from a feedback loop of subscribers and content. Specifically, to enter SVOD Market, a new entrant must obtain a critical mass of original content, but to purchase such a critical mass of content, the new entrant must have a critical mass of subscribers. This chicken-or-the-egg problem gives rise to the Content and Subscriber Barrier to Entry (the "CSBE").

118.    To begin with, original content is scarce and costly. To obtain that content, there must be sufficient subscriber revenue to fund content acquisition. As Statista reported in a January 24, 2020 article titled, "Netflix Splurges Cash on Content":

> To Netflix, subscriber growth is what iPhone sales are to Apple: the one metric that Wall Street tends to focus on, because it's well-known that the company's strategy of spending billions of dollars on content will only work if its subscriber base continues to grow.
>
> Over the past twelve months, Netflix spent more than $14.6 billion in cash on streaming content. Add to that $4.4 billion in content payments due within the next 12 months and another $3.3 billion due in more than a year,

---

[31] https://bit.ly/4q1Ni3j.
[32] https://bit.ly/4psD38h.

and it becomes clear why the company's shareholders are itching for new subscribers.

119.    The competitive bidding and spending for original content has been what has long fueled competition in the market, including the creation of novel and lauded streaming content. Indeed, it was a content war between HBO and Netflix that gave rise to the SVOD market. As Bloomberg News reported in an October 28, 2022 article titled "When Netflix and HBO Turned on Each Other, They Forged a New Era of Television":

> The defining conflict of this era would pit HBO against Netflix. During the days of DVDs, the relationship was a placid collaboration. But the shift to streaming TV quickly fractured the comity, replacing it with a fierce rivalry. In the years to come, Netflix would scramble to master HBO's original programming playbook faster than HBO could reverse engineer Netflix's expertise in data and technology.

120.    By 2024, content spending had ballooned to a staggering $126 billion across the streaming services, becoming the largest cost of doing business for the services. As The Wrap reported on October 29, 2024 in an article titled, "Netflix, Disney, Comcast, Google, Warner Bros., Discovery and Paramount to Spend Combined $126 billion on Content in 2024":

> Netflix, Disney, Comcast, Google, Warner Bros. Discovery and Paramount are on track to invest a combined $126 billion in content in 2024, according to a new forecast by Ampere Analysis.
>
> The firm's estimate translates to a record 51% of total content spend, up from 47% in 2020. Ampere anticipates that $40 billion will be allocated specifically towards the companies' streaming services. Original content has accounted for over $56 billion in investment of 45% of total spend, since 2022.

121.    As the article reported, Netflix was the largest investor in streaming content:

> Netflix is the top investor in global streaming content with an average annual investment of $14.5 billion in original and acquired programming since the COVID-19 pandemic. That growth is expected to continue with the acquisition of WWE wrestling matches in 2025 and its Christmas Day NFL games. . . .

1
2
3
4
5
6
7
8
9



10    122.    The same feedback loop that creates the CSBE is also the virtuous circle that fuels

11  Netflix's dominance. As Fortune reported on January 22, 2025 in an article titled, "Amazon's 'flywheel'

12  created a $2.4 trillion company—Netflix blowout earnings show how the streaming company is

13  replicating the tactic," Netflix's "flywheel" operates much like Amazon's in e-commerce:

14
15              Now, after Netflix's market value surged more than $40 billion following
                a blowout earnings report on Tuesday that revealed record subscriber
16              growth. It's clearer than ever that one of Amazon's biggest streaming rivals
                is doing the same.
17
18              "The virtuous cycle continues (invest to earn engagement -> lower churn -
                > better cash flow -> investment -> engagement . . .)," is how Jason Kilar,
19              an early Amazon executive who went on to run Hulu and then
                WarnerMedia as CEO, put it in a tweet on Tuesday.
20
21
22
23
24
25
26
27
28

1
2
3
4
5
6
7
8
9



10    123.    The same flywheel worked in Netflix's favor in its market. As Jeff Wlodarczak of Pivotal

11    Research Group is reported to have stated:

> "The key for NFLX going forward is to press their advantages and keep
> the subscriber/ARPU flywheel going," he wrote, using an abbreviation for
> average revenue per user, "because the larger they get the more leverage
> they have over their peers/content creators, the better their product gets
> (allowing them to drive subscriber/ARPU growth), the more cash they have
> to spend on compelling content and the bigger the moat grows around their
> core business model."

17    124.    Netflix's CFO, Spencer Neumann, echoed the sentiment expressed by Kilar:

> Back to Netflix: Chief financial officer Spencer Neumann also highlighted
> his own spin on how Netflix's version of the flywheel works on Tuesday's
> earnings call. "The flywheel starts with engagement," Neumann said. "It's
> engagement, revenue, profit, and it drives the flywheel."

21    125.    To some, the flywheel creating the moat around Netflix's market and business meant that

22    Netflix had become dominant, particularly given its large number of subscribers. As Media Play News

23    reported on April 28, 2025 in an article titled, "Who Is Evan Shapiro and Why Is He Saying the Streaming

24    Wars Are Over?":

> The 'Netflix flywheel is in full effect," Fishman wrote. "Because Netflix
> has more subscribers to spread its content spending across, it can afford to
> spend more on content. Because it has more content, it drives better

25
26
27
28

> engagement, leading to more subscribers and possibly better pricing power
> in a virtuous cycle. This is the enduring power of Netflix's first-mover
> advantage in [the streaming market]."

(brackets in original).

126. The feedback loop at the heart of the CSBE does not merely arise from the revenue derived from a critical mass of subscribers, it also derives from the data gleaned from subscriber viewing habits. That is, a critical mass of subscribers is necessary to determine what sort of content to create and acquire—and to recommend and surface to users from an otherwise unwieldy and opaque content library. In other words, the subscriber base also informs content creation and acquisition—it tells the company what to spend precious subscription revenue on.

127. As Panabee reported in a November 17, 2025 article titled "What is Netflix (NFLX)'s Moat?":

> Netflix (NFLX) commands a significant competitive advantage rooted in
> its vast global subscriber base, extensive library of original content, and
> powerful brand recognition. This scale creates a virtuous cycle where
> subscriber data informs a massive content budget, leading to hit shows that
> attract and retain users. The greatest threat is the intensifying competition
> from well-capitalized media companies, which fragments the market and
> escalates content acquisition costs.

128. Put simply, the CSBE is strengthened as any individual market participant, particularly Netflix, acquires a larger subscriber base. This provides that company not only a revenue war chest to purchase and create original content, but also the data required to predict what will draw and keep users, and to surface relevant content from within a necessarily large and potentially opaque library of movies, tv shows, and other content.

129. Likewise, the CSBE is strengthened when any given market participant obtains a greater library of streaming content. That content draws more users and reduces churn, which creates a virtuous circle of subscriber revenue and data, which allows even more content spending.

## V.     THE RELEVANT MARKET

130. The relevant market is the Subscription Video on Demand Market (the "SVOD Market").

**A.    The SVOD Market Is a Distinct Product Market**

131.    Several relevant factors indicate that the SVOD Market is a distinct product market.

132.    ***Industry and public sources recognize the SVOD Market as a separate economic entity.*** The SVOD Market is widely recognized by industry and public sources. For example, as Statista states in a February 18, 2025 article titled, "Subscription video-on-demand in the U.S.—statistics & facts":

> Popular with media consumers of all ages and generating billions of U.S. dollars in revenue in the United States alone, subscription video-on-demand (SVOD), an entertainment programming model where users pay a monthly fee in exchange for instant access to a streaming library, is certainly here to stay.

133.    As Statista recognizes in an article titled, "Market shares of selected subscription video-on-demand (SVOD) services in the United States in 4th quarter 2024," the market participants include Amazon Prime Video, Netflix, MAX (HBO Max), Disney+/Hulu, Paramount+, Apple TV+, Peacock, and others. An estimate of the market shares as of the 4th quarter of 2024 are as follows:

**Details:** United States; JustWatch; October 1 to December 31, 2024; measured interest in SVOD services on JustWatch, when users add movies and TV shows to their watchlist and select certain streaming services

134.    The Wall Street Journal recognized the same market participants in a November 12, 2025 article titled, "Streaming Prices Are Soaring—and Consumers are Still Paying":

> In recent weeks, the streaming platforms HBO Max, Hulu and Disney+ all hiked prices for at least some of their services. Netflix did so in January, Peacock unveiled increases in July, and Apple TV detailed its latest bump in August. Paramount said Monday it would raise the price of Paramount+ early next year.

135.    Each of these market participants is widely recognized by industry and public sources as a direct, horizontal competitor in the United States SVOD Market.

136.    The New York Times also recognized the SVOD Market as distinct from linear television in a July 10, 2019 article titled, "The Great Race to Rule Streaming TV":

> In the golden age of what's now called linear television—when viewing patterns were more predictable and, DVRs notwithstanding, more controllable—people had to watch what they wanted to watch when

networks wanted them to watch it. But the advent of digital platforms streaming video on demand (S.V.O.D.s, in trade lingo) has broken the 24-hour day into infinite possibilities. Questions once crucial have been made irrelevant: "Does this show deserve a prime-time spot?" "Would this make a good lead-in to that?" The success of a given streaming show isn't determined by how many people watch it but by how many subscriptions it helps to generate or maintain. The programming goal of an S.V.O.D., then, is an overall atmosphere of plentitude, a constantly updating slate of would-be "tentpole shows," buttressed with enough theoretically watchable other stuff that viewers don't flee once "Stranger Things" is over. As one producer put it to me, the mission at a streaming service like Netflix is "to basically create channel surfing within Netflix"—to entice us into a walled garden where the plantings are so copious we never think of leaving.

137.    Industry news source Variety also recognizes the existence of the SVOD Market, which includes ad-supported streaming services and tiers. As Variety stated in a March 25, 2025 article titled, "Americans Now Spend $69 per Month on Video Streaming—and Nearly Half Think It's Too Much":

With U.S. subscription prices rising on average to $16 per month for subscription video-on-demand (SVOD) services, consumers appear to be feeling a pinch, the Deloitte report indicates—and younger generations surveyed are especially prone to canceling services or opt for less expensive (or free) ad-supported alternatives. According to the[] survey, 54% of SVOD subscribers have at least one ad-supported tier of a paid service, up from 46% last year.

138.    At bottom, the SVOD Market is universally recognized as distinct from other video delivery services, such as short-form video provided by YouTube and Tik Tok, and also distinct from linear television services, like traditional cable television.

139.    ***The SVOD Market has peculiar characteristics and uses.*** The SVOD Market has peculiar characteristics and uses. Unlike linear television, SVOD products allow customers to watch what they want, when they want it. SVOD consumers are not reliant on linear television network decisions about when a show will air and for how long.

140.    Moreover, SVOD services allow viewers to "binge" shows, meaning watch entire seasons of shows at once. Indeed, Netflix and other services often release entire seasons of television shows at once. Binge watching allows algorithms, such as Netflix's recommendation engine, to better home in on

content that appeals to its customers. As the New York Times reported in an interview with Netflix co-CEO Ted Sarandos in a May 25, 2024 article titled, "The Interview: The Netflix Chief's Plan to Get You to Binge Even More":

> If you're anything like me, you probably spent some large portion of this week sitting on your couch watching Netflix. I love romcoms—my latest obsession is a Turkish series called "Thank You, Next"—and the more rom-coms I watch, the more of them Netflix feeds to me. Maybe you've had this experience with sports documentaries, or thrillers, or biopics. It's something we've all gotten used to. Which means, as I'm pressing play on whatever comes up next, I'm not really thinking about the people who are deciding what I'm consuming. And that's why I wanted to talk to Ted Sarandos.
>
> Sarandos, 59, has been at Netflix for 24 years, nearly as long as Reed Hastings, one of the company's two founders. He is now co-chief executive and is in charge of Netflix's creative output. He oversaw the company's early expansion into streaming and pioneered the binge watch. Under him, Netflix developed that powerful algorithm that knows just what to serve up next. He was also the guy who greenlit Netflix's early original productions, like "House of Cards," making Netflix into a studio, not just a platform. . . .

141.  Unlike linear television, such as cable TV, SVOD products are more likely to allow binge watching, as such viewing habits allow for larger time spent on the platform. As the New York Times notes in a June 8, 2016 article titled, "Netflix Studied Your Binge-Watching Habit. That Didn't Take Long":

> While Netflix contends that the binge model is what viewers want, some traditional network and cable executives continue to argue that their week-to-week rollout of original programming keeps their shows in the cultural conversations for months at a time. Bingeing is obviously an option at other streaming services; several contracted Wednesday did not have comparable data, or did not respond to requests for it.

142.  Viewing habits on SVODs are also different for older shows, for which every season's episodes are available to be viewed one after the other. For example, viewers frequently watch shows like "The Office" repeatedly.

143.  SVOD products also allow for the use of recommendation engines. Companies like Netflix obtain significant amounts of data from viewer watching habits, which allows them to recommend

content. Linear television, such as cable television, rely on "ratings"—a sampling of viewer habits—to determine what people watch. Such linear platforms are unable to immediately recommend shows and movies to watch to customers.

144. As Wired reported in an August 22, 2017 article titled, "This is how Netflix's top-secret recommendation system works":

> More than 80 per cent of the TV shows people watch on Netflix are discovered through the platform's recommendation system. That means the majority of what you decide to watch on Netflix is the result of decisions made by a mysterious, black box of an algorithm. Intrigued? Here's how it works.
>
> Netflix uses machine learning and algorithms to help break viewers' preconceived notions and find shows that they might not have initially chosen. To do this, it looks at nuanced threads within the content, rather than relying on broad genres to make its predictions. This explains how, for example, one in eight people who watch one of Netflix's Marvel shows are completely new to comic book-based stuff on Netflix.

145. **_Unique production facilities._** SVOD products require significant infrastructure to produce. For example, SVOD platforms must be built upon servers that can not only serve video on-demand and without causing buffering problems for viewers, but also host the extensive AI and machine learning required to mine customer data, including for the recommendation engine.

146. As Fast Company reported in a March 17, 2025 article titled, "Netflix built an army of servers to stream TV—now it's powering games":

> A little over a decade ago, Netflix decided to take streaming into its own hands: Instead of relying on commercial content delivery services, the streamer built its own servers from scratch, and gave them away to internet service providers. Since then, Netflix has distributed over 18,000 of these servers, now installed in 6,000 locations spread across 175 countries, forming the company's Open Connect content delivery network.

147. Amazon also maintains large data centers from which it streams SVOD content to its Prime Video users. As Amazon explains on its website in an article titled, "Amazon Prime Video Uses AWS to Deliver Solid Streaming Experience to More than 18 Million Football Fans":

1
2

       Amazon Prime Video uses the Amazon Web Services (AWS) Cloud as the underlying technology for all its services. "AWS gives us the flexibility, elasticity, and reliability we require," Winston says.

3    148.    These servers require graphical processing units ("GPUs") or tensor processing units

4  ("TPUs") capable of processing vectors of information, meaning large, sequenced arrays of data at once.

5  Netflix, for example, has deployed GPUs for movie recommendations since at least 2014. Without the

6  GPUs, training time for deep learning and neural network systems would be prohibitively high.

7    149.    As a February 14, 2014 article titled "Netflix To Deploy GPU-Powered Neural Networks

8  for Deep Learning In Movie Recommendations":

9
10
11
12
13

       Netflix has long chased after methods of improving its movie recommendation algorithms, once even awarding a $1M prize to any team of people who could substantially improve on the then-current design. As part of that process, the company has been researching neural networks. Conventional neural networks are created with vast nodes of CPU cluster, often with several thousand cores in total. Netflix decided to go with something different, and built a neural network based on GPU cores.

14
15
16
17
18
19
20

       In theory, GPU cores could be ideal for building neural nets—they offer huge numbers of cores already linked by fast internal interconnections and with relatively large pools of onboard memory. Whether or not the approach could be adapted to work with Amazon's own cloud hosting and on shipping graphics hardware, however, was an entirely different question. What Netflix found in its research holds promise for such implementations in the future, provided that certain problems with underlying libraries are ironed out by Nvidia. It initially took the company's engineers more than 20 hours to "train" their neural network model; hand-optimizing the CUDA kernel eventually reduced this time to just 47 minutes.

21    150.    In addition, SVOD products require access to digital rights management ("DRM")

22  technology that provides assurances to content providers that their content will not be pirated or copied

23  by viewers.

24    151.    As Streaming Wars explains in a November 21, 2025 article titled, "Basics of Streaming:

25  The Role of DRM in Securing Premium Streaming Content":

26
27

       Digital Rights Management, or DRM, is one of the most fundamental technologies powering the global streaming industry. It protects premium movies, series, and live events from piracy and unauthorized redistribution.

28

As OTT platforms expand across devices and markets, DRM ensures studios can safely license their most valuable content while maintaining a seamless viewing experience for users. What began as a basic protection lawyer has now evolved into a sophisticated ecosystem of encryption standards, device-level policies, secure players, and automated compliance systems that together uphold the economics of streaming.

Why DRM Matters in Streaming

Streaming platforms handle billions of dollars worth of licensed content. Hollywood studios, sports leagues, and broadcasters require strict content protection before allowing distribution. Without DRM, new releases, 4k content, and live sports would never be accessible on OTT platforms. DRM prevents screen recording, illegal downloads, and unauthorized access, ensuring content owners maintain control over how and where their content is viewed. It also enables business logic like simultaneous stream limits, device registration, offline playback, and geographic rights enforcement. In a world where privacy grows rapidly across social media, IPTV services, and illicit apps, DRM remains the core defense mechanism that safeguards the streaming economy.

152.    ***Distinct customers/consumers.*** SVOD services have distinct customers from other video delivery systems. SVOD customers are interested in long-form or prestige content accessed on-demand through generic consumer devices, which is unavailable through alternate platforms.

153.    As explained above, SVOD customers are also more likely to binge content and are generally less interested in linear programming that is provided on a schedule.

154.    SVOD customers are also often younger "cord cutters," meaning that they have opted for SVOD products *instead* of cable or satellite television. These customers have been distinct since 2015. As the New York Times reported in an October 3, 2015 article titled, "Millennials and Cutting the Cord":

Cable is a tougher sell to millennials. Many do without it once they live in their own homes. Millennial households without children are the least likely to have cable—one quarter use the Internet or antennas instead.

155.    ***Distinct prices and sensitivity to price changes.*** Prices for SVOD products range from $12.99 for Apple TV to $24.99 for Netflix, depending on the subscription tier.

156.    As the Wall Street Journal reported in a November 12, 2025 article titled, "Streaming Prices Are Soaring—and Consumers Are Still Paying":



157.    These prices (which, as discussed elsewhere, have recently increased substantially marketwide) are distinct from the price of linear television, such as streaming live television products or cable/satellite TV products, which are priced four to five times the highest-priced SVOD products.

158.    As the Wall Street Journal reported in the same article, U.S. SVOD prices have soared since 2019 (when Disney first assumed operational control of Hulu, representing a smaller horizontal merger in the U.S. SVOD Market than the one challenged here):



159. ***Specialized vendors.*** Specialized vendors include providers of digital rights management, localization, and distribution services.

160. For example, Deluxe providers localization, such as subtitling, dubbing, audio, audio description, DFX, scripting, as well as distribution, such as mastering, quality control and Data I/O.

161. Deluxe provides these services to SVOD platforms. As its website states:

**B. Market Participants and Market Concentration**

162. Market participants include Amazon Prime Video (with an estimated 22% share), Netflix (with an estimated 21% share), MAX (HBO Max) (with an estimated 13% share), Disney+/Hulu (with

an estimated 23% share), Paramount+ (with an estimated 9% share), Apple TV+ (with an estimated 7%

shared), Peacock (with an estimated 1% share, and others (with an estimated combined share of 4%).

163.    The pre-Merger SVOD market has a Herfindahl-Hirschman index of 1,770, just shy of the

1,800 HHI the United States Department of Justice's Merger Guidelines considers highly concentrated.

The post-Merger HHI would be 2,316—an increase of 546—and would result in a concentrated market

under the DOJ Merger Guidelines. The proposed Merger is presumptively anticompetitive under the DOJ

Merger guidelines, as it would both create a highly concentrated market with a 100-point increase as well

as involve a 100-point increase that results in a firm with over 30% market share.

### C.    The Relevant Geographic Market

164.    The relevant geographic market is the United States SVOD Market. SVOD content is often

tailored for regional markets, and the United States region contains different content than international

markets.

165.    The terms and conditions of various SVOD products prohibit even access of their services

from outside the United States, and digital rights management systems associated with (and required to

view) SVOD content restrict the geographic locale within which content can be accessed.

166.    Further, viewers in the United States overwhelmingly consume English-language content.

Foreign content, such as Korea's *Squid Game*, must be localized for United States audiences.

167.    At bottom, there is generally no cross-elasticity between United States and international

SVOD products, particularly given regional DRM restrictions.

### D.    Barriers to Entry

168.    The SVOD market is protected by the Content and Subscriber Barrier to Entry (the CSBE)

described above.

169.    In addition, there are additional barriers to entry surrounding the SVOD Market.

Specifically, to enter the SVOD Market, a new entrant must obtain significant streaming infrastructure,

including low-latency computer servers that can provide responsive video streaming.

170.    Because a new entrant must enter at scale, the cost of minimal infrastructure for entry is

significant. It is a surmountable cost only for well-established companies, such as Disney and Hulu (now

merged and in the process of consolidating the once-respective Disney+ and Hulu SVOD services), which have built out significant infrastructure or can afford to do so. There have been no significant competitors in the SVOD that have recently entered at scale by building the required streaming infrastructure from scratch.

171.    Moreover, switching costs serve as an additional barrier to entry. Subscribers are reluctant to add new streaming subscriptions and will often do so only after canceling another streaming subscription. Thus, once a subscriber pays for Netflix or HBO Max, they are less likely to add an additional subscription service. This creates a lock-in effect, which strengthens the barrier to entry, as a new entrant will need significant content offerings to convince subscribers to incumbent services to add an additional subscription service or switch to the new service.

## VI.    THE NETFLIX-WBD MERGER, IF CONSUMMATED, WILL RESULT IN A SUBSTANTIAL LESSENING OF COMPETITON IN THE UNITED STATES SVOD MARKET

172.    The Merger, if consummated, will unquestionably cause significant and substantial harm to competition in the United States SVOD Market. The Merger would eliminate one of Netflix's closest and most capable rivals; confer upon Netflix unprecedented control over premium scripted content, blockbuster film franchises, and culturally significant intellectual property; and materially impair the ability of existing and potential competitors to discipline Netflix's pricing, output, and innovation decisions. These harms flow not from speculative concerns but from the structural realities of the SVOD market, the unique competitive relationship between Netflix and WBD, and the combined entity's foreseeable post-merger incentives.

173.    As discussed above, Netflix already is the dominant SVOD provider in the United States, by far leading all competitors in subscribers, share of viewing time, brand power, global scale, original content investment, and data-driven personalization capabilities. WBD, through HBO Max and its affiliated film and television studios, is one of a very small number of firms with the resources, talent relationships, and content portfolios necessary to constrain Netflix's behavior. Competition between these firms plays a central role in the development of premium long-form scripted entertainment, the pricing of SVOD services, and the volume and diversity of new programming available to consumers.

1    Eliminating WBD as an independent rival would remove a vital competitive force and fundamentally
2    alter the structure of the SVOD market.

3    174.    The Merger, if consummated, will injure competition by eliminating a head-to-head
4    rivalry in high-end content production and distribution. Netflix and WBD compete directly for top
5    creative talent, for production capacity, for audience attention, and for the development of prestige
6    programming that anchors their services. Post-Merger, Netflix would internalize WBD's creative and
7    production pipelines, reducing the competitive pressure that currently compels Netflix to invest in bold,
8    innovative, or risk-bearing projects. The elimination of this rivalry is likely to reduce overall content
9    output, diminish the diversity and quality of available content, and narrow the spectrum of creative voices
10   appearing on major streaming platforms.

11   175.    Indeed, a previous merger of U.S. SVOD competitors—Hulu and Disney (operator of
12   Disney+)—has led to substantial price increases across the U.S. SVOD market, with no new competitive
13   entry to counterweigh the Disney-Hulu merger. Disney acquired a majority stake in Hulu in 2019 as part
14   of its acquisition of Fox, and in the years since has increased operational control and begun to integrate
15   Hulu into its existing streaming platform, centered around Disney+. As a result, Hulu no longer operates
16   as a distinct competitor, and Disney has in fact announced plans to phase out Hulu as a standalone SVOD
17   product entirely, folding it within the Disney+ interface. This consolidation of Hulu-Disney+ operation
18   has coincided with price increases across the U.S. SVOD market, and no new competitive entry has
19   occurred to replace the soon-to-be-phased out Hulu SVOD service. The consolidation of Hulu with
20   Disney+ represented an approximate 250-point increase in HHI—less than half the more-than-500-point
21   HHI increase associated with the announced Netflix-WBD merger (as explained in more detail earlier in
22   this Complaint). In the even more concentrated SVOD market extant now (as against the market that
23   existed prior to the Hulu-Disney+ merger), a consolidation of even larger SVOD market leaders will near-
24   certainly lead to even greater price increases and other competitive harms, borne by SVOD subscribers
25   such as Plaintiff and the Proposed Class.

26   176.    The Merger, if consummated, will also harm competition by enabling Netflix to deny its
27   rivals access to critical content inputs by cutting off licensing. WBD controls some of the most valuable

28

and recognizable intellectual property in the world, including Harry Potter, DC Comics, Looney Tunes, Game of Thrones, and numerous film and television libraries that serve as essential inputs for downstream distributors. Many SVOD services and traditional programmers rely on WBD licensing arrangements to maintain the breadth of their offerings. Once merged, Netflix will have both the ability and the incentive to withhold or degrade access to these essential inputs—either by refusing to license them, delaying releases, restricting windows, or raising licensing prices. Such foreclosure would raise competitors' costs (and pass those costs down to consumers, including Plaintiff and the class members), impair rivals' ability to attract and retain subscribers, and ultimately reduce consumer choice.

177. The Merger, if consummated, would further injure competition by enabling Netflix to increase prices or degrade service quality without fear of competitive discipline. Netflix has demonstrated repeated willingness to raise subscription prices even while facing competition from full-scale rivals such as WBD. With WBD removed as an independent competitor, Netflix would face less pressure to maintain affordable pricing or high-quality content.

178. The Merger also threatens competitive harm in advertising markets as well. Netflix's growing advertising-supported tier and WBD's existing advertising-supported inventory would combine into a single, highly concentrated supplier of premium streaming ad space. Advertisers seeking reach in professionally produced long-form content would face fewer alternatives, enabling Netflix to raise prices or impose unfavorable terms. This concentration can also reduce incentives to innovate in ad-targeting, measurement, and viewer experience—further harming advertisers and consumers.

179. Injury to upstream creative labor markets is another significant competitive harm flowing from the Merger. Both Netflix and WBD are among the largest purchasers of scripted content in the United States. By consolidating these two major buyers, the merger diminishes opportunities for writers, directors, actors, and production professionals. The merged entity would possess heightened bargaining power, enabling it to suppress compensation, and impose more restrictive deal terms—and pass along those costs to Plaintiff and the class.

180. The Merger, if consummated, will also weaken innovation incentives. Competition between Netflix and WBD has driven the development of new formats, high-budget serial dramas,

boundary-pushing storytelling, and advanced recommendation technologies. Removing WBD from the competitive landscape will reduce experimentation and accelerate homogenization of content. Netflix's incentives to innovate diminish as its market position becomes more secure, creating a foreseeable reduction in both the quantity and creativity of new programming.

181.    A post-Merger Netflix's network effects would further entrench competitive harm and strengthen the CSBE, making it even more difficult for existing rivals to expand and effectively impossible for new entrants to emerge. As explained above, the CSBE reflects the mutually reinforcing relationship between (a) control over high-value premium content and (b) the scale of a platform's subscriber base. Content attracts subscribers, and subscribers fund further content investment and drive data-fueled recommendation and content surfacing systems; this feedback loop gives incumbents entrenched advantages that new entrants cannot replicate. The proposed acquisition strengthens the CSBE and deepens this structural moat by uniting the two firms whose content portfolios and subscriber networks play the most significant roles in driving SVOD engagement and subscription decisions in the United States.

182.    First, the merger concentrates under a single firm an unparalleled library of must-have premium content that competitors cannot duplicate. Netflix already commands one of the largest original-content pipelines in the world. WBD contributes a globally recognized set of franchises—including Harry Potter, DC Comics, Game of Thrones, The Sopranos, Succession, The Last of Us, Looney Tunes, and Warner Bros.' extensive film archives—that serve as anchor properties for SVOD consumption. The combination of Netflix's broad slate of originals with WBD's marquee franchises creates the largest and most comprehensive premium content library in the market. Because content is the primary mechanism through which subscribers choose and retain streaming services, this consolidation significantly enhances Netflix's ability to attract and keep subscribers and makes it far harder for rivals to meaningfully differentiate themselves. No entrant could assemble a comparable library, and no existing SVOD competitor could replicate this breadth of exclusive content, regardless of investment.

183.    Second, by augmenting Netflix's already enormous subscriber base with WBD's substantial and devoted HBO Max subscriber population, the merger reinforces the other side of the

CSBE. Post-merger, the combined entity will possess a subscriber footprint far larger than any competing SVOD service, enabling it to amortize production costs over a broader base, reduce per-subscriber costs, and invest more heavily in future content creation. This scale advantage directly heightens the CSBE: the more subscribers Netflix controls, the more efficiently it can produce and acquire content, and the more content it can deploy to attract additional subscribers, further widening the gap between itself and rivals. Smaller competitors—already struggling to reach minimum viable scale—will fall further behind in their ability to fund prestige programming or compete on depth of library.

184.    Third, the merger enhances the feedback loop that makes the CSBE so formidable. With control over WBD's premier content, Netflix would be able to lock in subscribers with a broader and more compelling slate of exclusive programming, increasing switching costs and reducing churn. A subscriber who relies on Netflix not only for Netflix originals but also for HBO's award-winning series and WBD's blockbuster franchises is substantially less likely to cancel the service or experiment with alternatives. This expanded lock-in effect further suppresses the ability of rivals to lure subscribers away, even with aggressive promotional pricing or niche content offerings. Because SVOD consumers typically maintain only a limited number of subscriptions, every incremental increase in Netflix's retention weakens competitors' ability to grow, thereby compounding the competitive harm.

185.    Fourth, the merger strengthens the CSBE by depriving competitors of WBD content they previously relied upon. WBD has historically licensed significant portions of its library to third parties, enabling competitors like Amazon, Hulu, and Peacock to diversify their offerings and compete more effectively. Following the merger, Netflix will have both the incentive and the ability to withhold or restrict access to this content, forcing rivals to compete without essential programming and further raising their acquisition costs. This foreclosure of third-party licensing opportunities is itself a multiplier on the CSBE: when rivals lose access to valuable content, their ability to attract subscribers diminishes, and Netflix's relative advantage automatically increases.

186.    Finally, the merger strengthens the CSBE in a way that is self-reinforcing and irreversible in competitive timescales. New entrants would face the impossible task of matching a vertically integrated content-and-subscriber ecosystem that has been assembled over decades and amplified through this

consolidation. Entrants cannot purchase or recreate historic franchises; they cannot quickly build a subscriber base in the tens of millions; and they cannot match the economies of scale or data advantages that accrue when one firm controls both the largest subscriber footprint and the richest content library in the market. The strengthened CSBE therefore becomes a structural barrier that freezes the competitive landscape in place and ensures that the combined Netflix–WBD entity remains dominant for the foreseeable future.

187.     These harms are not speculative or remote. Industry analysts, economists, and the public statements from Netflix and WBD indicate that Netflix expects the merger to increase subscriber counts, boost engagement, and generate significant cost efficiencies—results consistent with a reduction in competitive pressure. The merger poses a direct and immediate threat to the competitive process in the American SVOD market, altering incentives, raising rivals' costs, and expanding the merged firm's ability to exercise market power.

188.     Indeed, under the United States Department of Justice's Merger Guidelines, the Merger is presumptively anticompetitive. The DOJ Guidelines state that a "merger that creates or further consolidates a highly concentrated market that involves an increase in the HHI of more than 100 points is presumed to substantially lessen competition or tend to create a monopoly." The DOJ Guidelines also state that "a merger that creates a firm with a share over thirty percent is also presumed to substantially lessen competition or tend to create a monopoly if it also involves an increase in HHI of more than 100 points."

189.     According to Statista, the market share of SVOD services in the United States as of the fourth quarter of 2024 is as follows:[33]

---

[33] https://bit.ly/4ppZVVM.

1
2
3
4
5
6
7
8
9
10
11
12
13



14    190.    Further, both Disney+ and Hulu are now commonly owned, and are in the process of being

15    consolidated into a single, Disney+-branded interface.

16    191.    Based on the above market shares, the pre-Merger SVOD Market has an Herfindahl-

17    Hirschman Index ("HHI") of 1,770 (thirty points below the threshold for a "highly concentrated" market

18    under the DOJ Guidelines). If the Merger closes, the combined Netflix-WBD entity will enjoy a 34%

19    market share, and the resulting post-Merger HHI would be 2,316, an increase of 546. The proposed

20    Merger is presumptively anticompetitive under the DOJ Merger Guidelines, as it would both create a

21    highly concentrated market with a 100-point increase as well involve a 100-point increase that results in

22    a firm with over 30% market share.

23    192.    Netflix and WBD are certainly aware of the widespread criticism over the anticompetitive

24    effects of the proposed Merger and could have taken steps to help mitigate that criticism, but they have

25    declined to do so. For example, the Merger Agreement is devoid of any provisions requiring Netflix to

26    maintain WBD's historic licensing practices or to continue making WBD's content available to

27    competing distributors. Once the transaction closes, Netflix—which will become the owner of WBD and

28

1    its entire content library (excluding the carved out Global Networks division)—would have the unilateral

2    power to restrict access to that content in future licensing agreements, thus reducing consumer choice.

3        193.    The Merger Agreement contains no commitment to preserve WBD's existing third-party

4    licensing arrangements, no obligation to offer content on fair, reasonable, and non-discriminatory terms,

5    and no mechanism ensuring that rival SVOD platforms or linear networks will continue to have access

6    to critical programming previously supplied by WBD. The absence of any such protections will likely

7    result in a lessening of competition in the SVOD Market because WBD has long been a key supplier of

8    high-value, premium content that other distributors rely on to attract viewers. Without contractual limits,

9    Netflix is free to foreclose rivals or raise their costs by withholding or repricing WBD's signature

10   franchises, thereby reducing consumer choice and weakening competitive pressure across the SVOD

11   market.

12       194.    The Merger Agreement also places no restrictions on Netflix's ability to reorganize,

13   consolidate, or restructure WBD's operations after closing. By permitting Netflix to merge subsidiaries,

14   collapse divisions, or reallocate assets without restriction, the agreement effectively authorizes Netflix to

15   dismantle or downsize WBD's independent production and distribution units. This creates a substantial

16   risk that Netflix could eliminate overlapping programming pipelines, slow or discontinue development

17   of competing original content, or redirect WBD's creative resources exclusively toward Netflix's

18   strategic objectives. While such consolidation may be permissible as a matter of contract, its competitive

19   implications are significant: it may result in lower overall content output, reduced diversity of

20   programming, fewer independent creative voices, and diminished innovation in premium scripted

21   entertainment. Consumers ultimately bear the cost (and will see a reduction in choice) if a major content

22   originator is absorbed into the ecosystem of its largest competitor and loses its ability—or incentive—to

23   act independently.

24       195.    Furthermore, the Merger Agreement is entirely silent on public-interest safeguards, such

25   as commitments to preserve content diversity, protect independent production, maintain output levels, or

26   ensure continued availability of culturally significant programming. It contains no open-access

27   commitments, no obligations to maintain separate development pipelines, and no provisions requiring

28

continued distribution of HBO or WBD content beyond Netflix's own walls. By omitting any consumer-facing assurances or structural limitations, the agreement leaves Netflix free to exercise its expanded market power in ways that may lessen competition, reduce quality, increase prices, and narrow the range of content available to viewers. The lack of any affirmative consumer protections underscores the risk that the merger will result in exactly the type of competitive harm—reduced output, restricted choice, and diminished innovation—that Section 7 of the Clayton Act is designed to prevent.

## CLASS ACTION ALLEGATIONS

196.    The class's claims all derive directly from a course of conduct by Netflix. Netflix has engaged in uniform and standardized conduct toward the class. It did not materially differentiate in its actions or inactions toward members of the class. The objective facts on these subjects are all the same for all class members. Within each Claim for Relief asserted by the class, the same legal standards govern. Accordingly, Plaintiff brings this lawsuit as a class action on her own behalf and on behalf of all other persons similarly situated pursuant to Federal Rule of Civil Procedure 23.

197.    This action may be brought and properly maintained as a class action because the questions it presents are ones of a common or general interest, and of many persons, and also because the parties are numerous, and it is impracticable to bring them all before the court. Plaintiff may sue for the benefit of all as a representative party pursuant to Federal Rule of Civil Procedure 23.

### The Class

198.    Michelle Fendelander brings this action and seeks to certify and maintain it as a class action under Federal Rule of Civil Procedure 23 on behalf of herself and a class defined as follows:

> All persons, business associations, entities, and corporations who paid for
> an SVOD subscription to the WBD-controlled service now known as HBO
> Max from December 8, 2021, through the present (the "Class Period").

199.    Excluded from the nationwide class defined above is Netflix, its employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliates; the attorneys representing Plaintiff in this case and the attorneys' immediate family members and

employees; and the judicial officers and their immediate family members and associated court staff assigned to this case.

**Numerosity and Ascertainability**

200.    The members of the class are so numerous that a joinder of all members would be impracticable. Indeed, there are more than 50 million subscribers to WBD-owned SVOD platforms in the United States.

201.    The class is ascertainable. The class definition identifies groups of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of each group to self-identify as having a right to recover based on the description. Other than by direct notice, alternatively proper and sufficient notice of this action may be provided to the class members through notice disseminated by electronic means, through broadcast media, and published in newspapers or other publications. Moreover, WBD is in possession of all user contact information, including email addresses.

202.    A well-defined community of interest in questions of law or fact involving and affecting all members of the class exists, and common questions of law or fact are substantially similar and predominate over questions that may affect only individual class members. This action is amenable to the establishment of fair and equitable formulae for determining and allocating damages, through expert testimony applicable to anyone in the class.

203.    The most significant questions of law and fact that will decide the litigation are questions common to the class, or to definable categories or subclasses thereof, and can be answered by the trier of fact in a consistent manner such that all those similarly situated are similarly treated in the litigation. The questions of law and fact common to Plaintiff and class members, include, among others, the following:

   a.   Whether the Merger, if consummated, would substantially lessen competition in the U.S. SVOD Market;

   b.   Whether the SVOD Market is a relevant product market;

   c.   Whether the United States is a relevant geographic market;

d.   Whether there exists a Content and Subscriber Barrier to Entry protecting the U.S. SVOD Market;

e.   Whether the Merger, if consummated, would strengthen this CSBE;

f.   Whether the Merger, if consummated, would violate Section 7 of the Clayton Act;

g.   Whether the Merger, if consummated, will be a substantial contributing factor in the injury to members of the class;

h.   Whether members of the class are entitled to injunctive relief enjoining the Merger.

**Typicality**

204.    Plaintiff's claims are typical of the members of the class. For the proposed class, the evidence and the legal theories regarding Netflix's alleged wrongful conduct are substantially the same for Plaintiff and all class members.

**Adequate Representation**

205.    Plaintiff will fairly and adequately protect the interests of the class members. Plaintiff has retained competent counsel experienced in antitrust and class action litigation to ensure such protection. Plaintiff and her counsel intend to prosecute this action vigorously and have the financial resources to do so. Neither Plaintiff nor her counsel have interests adverse to those of the class.

**Superiority**

206.    This action satisfies the requirements of Fed. R. Civ. P. 23(b)(2) because Netflix has acted and refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive and/or corresponding declaratory relief with respect to the class as a whole.

207.    Plaintiff is not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action. Rule 23 provides the court with authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges.

1

**REALLEGATION AND INCORPORATION BY REFERENCE**

2   208.   Plaintiff realleges and incorporates by reference all the preceding paragraphs and

3   allegations of this Complaint, as though fully set forth in the following Claim for Relief asserted on behalf

4   of the class.

5   **CLAIM FOR RELIEF**

6   <u>**COUNT ONE**</u>
7   **Section 7 of the Clayton Act, 15 U.S.C. § 18**

8   209.   Plaintiff Fendelander brings her claim under Section 7 of the Clayton Act on behalf of

9   herself and the nationwide class.

10   210.   The Merger will have the effect of substantially lessening competition in the United States
11   SVOD Market.

12   211.   As alleged in this Complaint, if the Merger is consummated, it will substantially
13   strengthen the CSBE, which will insulate the combined Netflix-WBD entity from competition and
14   competitive entry in the United States SVOD Market.

15   212.   The Merger, if consummated, will also result in the elimination of competition from one
16   of Netflix's largest rivals, leaving only a handful of significant SVOD providers in the market. WBD is
17   one of a small number of firms with the scale, production capabilities, and content libraries necessary to
18   constrain Netflix's market power. WBD's scripted dramas, franchises, feature films, and premium
19   originals serve as close competitive substitutes for Netflix's own content offerings and play a significant
20   role in consumer decisions regarding subscription, churn, and viewing time. As explained above, this
21   reduction in competition will directly result in higher prices to Plaintiff and the class, reduced output,
22   diminished content diversity, lower investment in innovative or risky programming, and reduced
23   consumer choice. Without WBD's competitive pressure, Netflix would have greater ability and incentive
24   to raise subscription fees, reduce the quality or breadth of its content slate, or withhold premium content
25   to foreclose rivals.

26   213.   The Merger, if consummated, would also enhance Netflix's incentive to bar competing
27   SVOD providers from accessing WBD's extensive library of valuable intellectual property. WBD's

28

content portfolio—including top-tier film franchises, premium HBO originals, and DC Entertainment properties—is essential for many rival streaming services to compete for subscribers. Post-merger, Netflix would be able to restrict or eliminate such licensing to weaken competitors.

214.    The Merger, if consummated, also would further entrench Netflix's dominant position by granting it control over WBD's production facilities, distribution infrastructure, data assets, and relationships with creative talent, thereby raising barriers to entry for smaller or emerging SVOD services.

215.    A previous merger in the same market—between Disney and Hulu, leading to the ongoing consolidation of the Disney+ and Hulu services—has coincided with sharply rising SVOD prices marketwide and has not been offset by new competitive entry. This even-larger horizontal SVOD merger, taking place in an even more concentrated U.S. SVOD Market, can be expected to cause even more significant price inflation and related competitive harms to U.S. SVOD consumers like Fendelander the Class Members, if the merger is allowed to close.

216.    The Merger is a transaction in interstate commerce, as it involves the merger of two U.S. SVOD providers operating in different states and using interstate wires and telecommunications infrastructure to provide SVOD services between states. Moreover, the Merger, if consummated, would affect markets and products that use the instrumentalities of interstate commerce, including the Internet.

217.    Plaintiff and the Class Members face a significant threat of irreparable antitrust injury through the Netflix-WBD merger, as described in this Complaint.

218.    Plaintiff and the Class Members seek appropriate injunctive relief to remedy the significant threat of irreparable antitrust injury alleged in this Complaint, including (as appropriate) through enjoining the Netflix-WBD merger and ordering adequate safeguards.

219.    There is no adequate remedy at law, such as through monetary damages, for the significant threat of irreparable antitrust injury to Plaintiff and the Class Members.

220.    Considering the balance of hardships between the Plaintiff and Class Members, on the one hand, and Defendant Netflix, on the other, a remedy in equity is warranted.

221.    The Clayton Act expressly authorizes injunctive relief as requested in this matter, and such relief is available under the Constitution and under conventional equitable principles.

222.    The public interest would not be disserved by an injunction in this case.

223.    Plaintiff and members of the class also seek to recover their costs of suit, including attorneys' fees.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that judgment be entered against Netflix and that the Court grant the following:

A.    Determine that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23;

B.    Enter a judgment in favor of Plaintiff and the Class declaring that Netflix has committed the violations of law alleged in this case;

C.    Award declaratory relief;

D.    Award Plaintiff the costs of bringing this action, including reasonable attorneys' fees, expert fees, and expenses;

E.    Issue an appropriate injunction preventing the Merger and/or requiring pre-closing divestiture or disclosure to remedy any anticompetitive effects of the combination;

F.    Grant further relief as this Court may deem just and proper.

1

2

Dated: December 8, 2025                              Respectfully submitted,

3       _/s/ Brian J. Dunne_                              _/s/ Yavar Bathaee_
        Brian J. Dunne (CA 275689)                    Yavar Bathaee (CA 282388)
4       bdunne@bathaeedunne.com                        yavar@bathaeedunne.com
        Edward M. Grauman (*pro hac vice* forthcoming)   Andrew C. Wolinsky (CA 345965)
5       egrauman@bathaeedunne.com                      awolinsky@bathaeedunne.com
        Kathryn J. Johnson (*pro hac vice* forthcoming)  Priscilla Ghita (*pro hac vice* forthcoming)
6       kjohnson@bathaeedunne.com                      pghita@bathaeedunne.com
7       **BATHAEE DUNNE LLP**                          Bryce W. Talbot (*pro hac vice* forthcoming)
        901 South MoPac Expressway                     btalbot@bathaeedunne.com
8       Barton Oaks Plaza I, Suite 300                 **BATHAEE DUNNE LLP**
        Austin, TX 78746                               445 Park Avenue, 9th Floor
9       Tel: (213) 462-2772                            New York, NY 10022
                                                       Tel: (332) 322-8835
10
11      Allison Watson (CA 328596)                     *Attorneys for Plaintiff and the Proposed Class*
        awatson@bathaeedunne.com
12      **BATHAEE DUNNE LLP**
        3420 Bristol Street Suite 600
13      Costa Mesa, CA 92626
        Tel: (213) 462-2772
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28